Francis J. Balint, Jr. (State Bar No. 007699)
Andrew S. Friedman (State Bar No. 005425)
BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.
2325 E. Camelback Road, Ste. 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Fascimile: (602) 274-1199
fbalint@bffb.com
afriedman@bffb.com

*Attorneys for Plaintiff Richard Di Donato*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Di Donato, Individually and On Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Insys Therapeutics, Inc.; Michael L. Babich; Darryl S. Baker; and John N. Kapoor, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Richard Di Donato ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon an investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the filings of Insys Therapeutics, Inc. ("Insys" or the "Company") with the United States Securities and Exchange Commission ("SEC"), Company news releases and conference calls, public statements issued by Defendants, securities analyst reports, and media and industry reports.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after Plaintiff has had a reasonable opportunity to conduct discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Insys common stock between March 3, 2015 and January 25, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Insys is a commercial-stage specialty pharmaceutical company that develops and commercializes supportive care products primarily designed to assist patients with pain management attributable to their disease, treatment, or therapy.

3.     The Company's principal product and source of revenue is Subsys, a sublingual fentanyl spray designed to treat breakthrough cancer pain ("BTCP") in opioid-tolerant patients.

4.     Throughout the Class Period, Defendants (defined herein) made false and misleading statements and failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants failed to disclose that: (i) the Company was engaged in the illegal and improper off-labeling marketing of Subsys; (ii) certain Insys employees—including Defendant Michael L. Babich, the President and Chief Executive Officer of Insys during much of the Class Period—were complicit in an illegal

kickback scheme operated for the purpose of increasing prescriptions of Subsys; and (iii) as a result, the Company's financial statements were materially false and misleading at all relevant times.

5. After the close of the market on April 24, 2015, the Southern Investigating Report Foundation ("SIRF") published an article entitled "Insys Therapeutics and the New 'Killing It,'" reporting on patients who either died or suffered adverse events while being treated with Subsys. The article also detailed how Insys aggressively markets Subsys.

6. On this news, the price of Company shares declined $6.00 per share, or nearly 10%, from a close of $62.42 per share on April 24, 2015, to close at $56.42 per share on April 27, 2015.

7. Then, on May 20, 2015, *Seeking Alpha* published an article entitled "Top prescribers of Insys Therapeutics' Subsys arrested on drug charges," reporting that two of Insys's highest-volume prescribers had been charged with illegal prescription drug distribution by the Drug Enforcement Agency ("DEA").

8. On this news, the price of Company shares declined $2.65 per share, or more than 4%, from a close of $59.77 per share on May 19, 2015, to close at $57.12 per share on May 20, 2015.

9. On June 25, 2015, *The New York Times* reported that a nurse in Connecticut pled guilty to participating in a kickback scheme wherein she accepted approximately $83,000 in kickbacks from Insys in exchange for writing more than $1 million worth of Subsys prescriptions.

10.     On this news, the price of Company shares declined $3.00 per share, or nearly 8%, from a close of $38.74 per share on June 24, 2015, to close at $35.74 per share on June 25, 2015.[1]

11.     On December 3, 2015, SIRF published an article entitled "Murder Incorporated: Insys Therapeutics, Part I," alleging that Defendant Babich had been forced to resign from the Company by Defendant John N. Kapoor—the Company's founder and the Executive Chairman of Insys's Board of Directors—and that the Company operated a scheme to promote the illegal and improper off-label marketing and sale of Subsys.

12.     On this news, the price of Company shares declined $5.93 per share, or nearly 19%, from a close of $31.99 per share on December 2, 2015, to close at $26.06 per share on December 3, 2015.

13.     On January 25, 2016, SIRF published an article entitled "The Brotherhood of Thieves: Insys Therapeutics," alleging that Insys's executives have continued to pressure Company employees to develop new schemes to promote the illegal and improper off-label marketing and sale of Subsys.

14.     On this news, the price of Company shares declined $1.07 per share, or nearly 5%, from a close of $22.65 per share on January 24, 2016, to close at $21.58 per share on January 25, 2016.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), and 78t(a) and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.P.R. § 2401.10b-5.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 12 U.S.C. § 78aa.

---

[1]     On June 5, 2015, Insys effected a two-for-one stock split of the Company's common stock, which began trading on a spit-adjusted basis on June 8, 2015.  All share prices after June 8, 2015 reflect the June 5, 2015 two-for-one stock split.

Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b), as Insys's principal place of business is located within this District.

17.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

18.    Plaintiff Richard Di Donato, as set forth in the accompanying certification, incorporated by reference herein, purchased Insys common stock at artificially inflated prices during the Class Period and has suffered damages as a result of the federal law violations and false and/or misleading statements and/or material omissions alleged herein.

19.    Defendant Insys is incorporated in Delaware and maintains its principal executive offices at 1333 South Spectrum Boulevard, Suite 100, Chandler, Arizona, 85286.  Insys's common stock trades on the NASDAQ under the ticker symbol "INSY."

20.    Defendant Michael L. Babich ("Babich") was the Company's President and Chief Executive Officer throughout the Class Period until his resignation on or before November 5, 2015.

21.    Defendant Darryl S. Baker ("Baker") was the Company's Chief Financial Officer throughout the Class Period.

22.    Defendant John N. Kapoor ("Kapoor") is the Executive Chairman of the Board of Directors of Insys and was appointed President and Chief Executive Officer on or before November 5, 2015.

23.    Defendants Babich, Baker, and Kapoor are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Insys's reports

to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors—*i.e.*, the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

24. Defendants Insys, Babich, Baker, and Kapoor are collectively referred to herein as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

25. Insys, a Delaware company headquartered in Chandler, Arizona, is a commercial-stage specialty pharmaceutical company that develops and commercializes supportive care products designed to assist patients with the side effects attributable to their disease, treatment, or therapy.

26. The Company has two marketed products: (i) Subsys; and (ii) Drabinol SG Capsule. Subsys is a sublingual fentanyl spray designed to treat BTCP in opioid-tolerant patients. Subsys is classified as a transmucosal immediate-release fentanyl ("TIRF") and competes in the TIRF market. Drabinol SG Capsule is a generic equivalent to Marinol (dronabinol), which is an approved second-line treatment for both chemotherapy-induced nausea and vomiting ("CINV") and anorexia associated with weight loss in patients with Auto Immune Deficiency Syndrome ("AIDS").

**B.**   **Materially False and Misleading Statements**

27.    On March 3, 2015, the Company released its annual report for the 2014 year ("2014 Annual Report") on Form 10-K filed with the SEC.  In its 2014 Annual Report, the Company indicated that: (i) Subsys commands a substantial portion of the market share for TIRF products; (ii) the Company can increase the market penetration of Subsys; and (iii) the Company can leverage its commercial organization to effectively market Subsys.

28.    Regarding Subsys's market share of the TIRF market, the Company stated: In December 2014, Subsys was the most prescribed TIRF product with 40.2% market share on a prescription basis. . . . Through our ongoing commercial initiatives, we believe we can continue to grow our market share and net revenue for Subsys.  According to Source Healthcare Analytics, in 2014, TIRF products generated $450.4 million in annual U.S. product sales.  Traditionally, the physician prescriber base for TIRF products is concentrated, with approximately 1,594 physicians writing 90% of all TIRF product prescriptions in 2014, according to IMS.  As a result, our commercial organization has been able to promote Subsys using a highly targeted approach designed to maximize impact with physicians who are TIRF REMS enrolled.  In addition, our commercial organization continues to specifically target oncology health care providers and practices.

29.    The Company also stated that "We believe that we can continue to increase Subsys net product revenue through further market penetration and educating the medical community to ensure that patients are titrated to an effective dose of Subsys and have access to Subsys."

30.    Regarding its product commercialization efforts, the Company stated that: "We commercialize Subsys through a cost-efficient commercial organization utilizing an incentive-based sales model similar to that employed by Sciele Pharma and other companies previously led by members of our board of directors, including our founder and Executive Chairman."

31.     Also on March 3, 2015, the Company filed its Fourth Quarter 2014 financial results and Year End 2014 financial results with the SEC on Form 8-K.  For the Fourth Quarter 2014, the Company announced revenues of $66.5 million, of which $66.1 million were attributed to sales of Subsys, an increase of 69% from the Fourth Quarter 2013.  The Company reported Fourth Quarter 2014 net income of $9.3 million, or $0.25 per diluted share.

32.     For the Year End 2014 financial results the Company reported revenue of $222.1 million, of which $219.5 million was attributed to the sales of Subsys.   The Company reported Year End 2014 net income of $38 million, or $1.04 per diluted share.

33.     On May 7, 2015, the Company issued a press release announcing its First Quarter 2015 financial results.  For the First Quarter 2015, the Company announced revenues of $70.8 million, of which $70.5 million were attributed to sales of Subsys, an increase of 74% from the First Quarter 2014.  The Company reported First Quarter 2015 net income of $8 million, or $0.21 per diluted share.  Regarding the Company's First Quarter 2015 financial results, Defendant Babich stated: "Insys had another strong quarter, driven by our twelfth consecutive quarter of Subsys sales growth.  We expect this will remain our largest near-term revenue driver as we advance the many projects in our pipeline through clinical trials and bring them to market."  Defendant Babich stated further: "By continuing to focus our clinical, regulatory and commercial expertise on developing and successfully commercializing innovative products, we expect to deliver long-term value for our shareholders."

34.     On May 11, 2015, the Company filed its financial results for the quarter ending March 31, 2015 on Form 10-Q, in which the Company restated their previously announced financial results for the First Quarter 2015.

35.     On August 6, 2015, the Company issued a press release announcing its Second Quarter 2015 financial results.  For the Second Quarter 2015, the Company announced revenues of $77.6 million, of which $76.7 million were attributed to sales of

Subsys, an increase of 40% from the Second Quarter 2014.  The Company reported Second Quarter 2015 net income of $7.3 million, or $0.10 per diluted share.  Regarding the Company's Second Quarter 2015 financial results, Defendant Babich stated: "Insys had another strong quarter, driven by our thirteenth consecutive quarter of Subsys sales growth.  While we expect this will remain our largest near-term revenue driver, we are very pleased to have submitted the NDA for Dronabinol Oral Solution."  Defendant Babich stated further: "By continuing to focus our clinical, regulatory, and commercial expertise on developing and successfully commercializing innovative products, we expect to deliver long-term value for our shareholders."

36.    On August 6, 2015, the Company filed its financial results for the quarter ending June 31, 2015 on Form 10-Q, in which the Company restated their previously announced financial results for the Second Quarter 2015.

37.    On November 5, 2015, the Company issued a press release announcing its Third Quarter 2015 financial results.  For the Third Quarter 2015, the Company announced revenues of $91.3 million, of which $91.1 million were attributed to sales of Subsys, an increase of 57% from the Third Quarter 2014.  The Company reported Third Quarter 2015 net income of $26.1 million, or $0.34 per diluted share.

38.    The Company also announced on November 5, 2015 that Defendant Babich had stepped down as the Company's President and Chief Executive Officer and would be replaced by Defendant Kapoor.  Regarding the Company's Third Quarter 2015 financial results, Defendant Kapoor stated: "Today we reported record results and our twelfth consecutive quarter of profitability at Insys.  We have driven top line revenue expansion with our market-leading brand, Subsys, and see opportunity for further market share gains in the coming quarters."

39.    On November 5, 2015, the Company filed its financial results for the quarter ending September 31, 2015 on Form 10-Q, in which the Company restated their previously announced financial results for the Third Quarter 2015.

40.    The above statements regarding the Company's business and operations were materially false and misleading.  Specifically, Defendants failed to disclose that: (i) the Company was engaged in the illegal and improper off-labeling marketing of Subsys; (ii) certain Insys employees—including Defendant Babich—were complicit in an illegal kickback scheme operated for the purpose of increasing prescriptions of Subsys; and (iii) as a result, the Company's financial statements were materially false and misleading at all relevant times.

**C.    The Truth Begins to Emerge**

41.    On April 24, 2015, after the close of market, SIRF published an article entitled "Insys Therapeutics and the New 'Killing It'" which reported that patients on Subsys had suffered adverse events, including death, and that the Company's Subsys commercialization program was promoting Subsys through various aggressive schemes. The article stated, in relevant part:

> The Southern Investigative Reporting Foundation asked Adverse Events, a California-based consultancy that collects and analyzes drug side effect data to analyze the FDA's Adverse Event Reporting System's tracking of fatalities related to Subsys.  (In medical terms, an adverse event is defined as an undesirable outcome related to a drug's use and includes categories in addition to death.)
>
> The analysis shows Subsys was referenced in 63 adverse event reports resulting in deaths since its January 2012 FDA approval.  Participation in the FAERS database is voluntary -- a prescribing physician might not learn of an adverse event related to a drug; others elect not to report them.  Because of this, many in the medical industry argue -- privately -- that FAERS' data skews toward the lowest potential occurrence rate.
>
> Given the relatively sparse amount of FAERS data that the Southern Investigative Reporting Foundation obtained (just age, gender and date of death are provided), placing the death

of 63 Subsys users in a broader context is not so cut-and-dried. Certainly it's reasonable to suppose that a percentage of those prescribed Subsys have cancer and would naturally have a higher rate of mortality.  Some FAERS entries list Subsys along with one or two additional drugs.  But dying of cancer isn't usually considered an adverse pharmacological event; dying of respiratory failure when taking Subsys for a migraine is.

*** 

So how has Insys managed to grow exponentially?

The answer appears to have multiple parts: a truly unique sales force paired with a corporate speakers program that provides a stream of ready cash to frequent prescription writers.

There's no way around it: Insys' sales force is very different from its competitors in the pharmaceutical industry.   One reason is that a pharmaceutical sales background or even college courses in science are not required.  Another is that if a candidate appears to be driven and aggressive, the company will look past things that a local Starbucks might not.

***

A qui tam claim filed last year by former Insys salesman Ray Furchak alleged that the speakers program's sole purpose was, in the words of his then supervisor Alec Burlakoff, "to get money in the doctor's pocket."   The catch, Furchak alleged, was that the doctors who increased the level of Subsys prescriptions, and at higher dosages (such 400 or 800 micrograms instead of 200 micrograms), would receive the invitations to the program -- and the checks.

The claim described texts from Burlakoff to Furchak and other sales colleagues regularly demanding that "doctors be held accountable" and that "doctors who are not increasing their clinical experience [prescription writing], please cancel, suspend, and cease doing speaker programs."

42.    On this news, the price of Company shares declined $6.00 per share, or nearly 10%, from a close of $62.42 per share on April 24, 2015, to close at $56.42 per share on April 27, 2015.

43.     On May 20, 2015, *Seeking Alpha* published an article entitled "Top prescribers of Insys Therapeutics' Subsys arrested on drug charges," reporting that two of Insys's highest-volume prescribers had been charged with illegal prescription drug distribution by the DEA.  The article stated, in relevant part:

> Two Mobile, AL-based pain specialists, Dr. Xiulu Ruan and Dr. John Patrick Couch were arrested today on charges of illegal prescription drug distribution and conspiracy to commit healthcare fraud to increase insurance reimbursements.  Both doctors, owners of Physicians' Pain Specialists of Alabama Pain Center, are the top prescribers of Insys Therapeutics' (NASDAQ:INSY) Subsys (fentanyl sublingual spray), a powerful opioid for the management of pain in adult cancer patients.  Neither doctor is a board-certified oncologist.

44.     On this news, the price of Company shares declined $2.65 per share, or more than 4%, from a close of $59.77 per share on May 19, 2015, to close at $57.12 per share on May 20, 2015.

45.     On June 25, 2015, *The New York Times* published an article entitled "Nurse Pleads Guilty to Taking Kickbacks From Drug Maker" which reported that a nurse in Connecticut pled guilty to federal charges for participating in a kickback scheme wherein she accepted approximately $83,000 in kickbacks from Insys in exchange for writing more than $1 million worth of Subsys prescriptions.

46.     On this news, the price of Company shares declined $3.00 per share, or nearly 8%, from a close of $38.74 per share on June 24, 2015, to close at $35.74 per share on June 25, 2015.

47.     On December 3, 2015, SIRF published an article entitled "Murder Incorporated: Insys Therapeutics, Part I," alleging that Defendant Babich had been forced to resign from the Company by Defendant Kapoor and that the Company operated a scheme to promote the illegal and improper off-label marketing and sale of Subsys.  The article stated, in relevant part:

On Nov. 2, on the eve of an earnings announcement, CEO Babich suddenly resigned -- a move that typically raises a major red flag for investors.  Kapoor, who assumed the CEO mantle, told those listening on the conference call, "Mike decided that now is the best time to turn the page and focus on his family as well as pursue new opportunities."

Babich was forced out by Kapoor, according to a senior Insys executive who was in regular contact with Kapoor in the days prior to the announcement.  While both men are the subjects of intense regulatory scrutiny, the founder and chairman bluntly told his lieutenant of 14 years that Babich was closest to the issues that federal prosecutors were looking at and that a change had to be made should settlement talks became serious, according to the executive source.

While Babich may be spending time with his young family, his personal life is more complex.

Earlier this year, Babich began a relationship with Natalie Levine, then a Boston area Insys sales executive who subsequently became pregnant; they married in the summer. (This is Babich's second romance with a sales colleague; Kapoor has also dated two sales executives.)  Aside from the fact that it's unusual for a public company CEO to date someone who reports to him, the Babich-Levine relationship had another dynamic to it.

The newlyweds will probably be monitoring the developments in a rapidly expanding criminal suit filed in the U.S. District Court in Hartford where Heather Alfonso, an advanced practice registered nurse who was a high-volume Subsys prescriber over the past two years, pleaded guilty to accepting $83,000 in kickbacks.  Federal prosecutors, according to the transcript of the July plea hearing, allege that the kickbacks prompted her to write Subsys prescriptions worth $1.6 million.

What appears to have brought the federal prosecutors' intense scrutiny of the divorced mother of four was the baldness of the scheme.  According to her plea, Alfonso was paid $1,000 each time she attended an Insys speakers event, where she

was supposed to discuss with other medical professionals her clinical experience of Subsys.  In reality, however, no other prescribers were present, and prosecutors said the events amounted to nothing more than Insys-sponsored dinners and drinks for Alfonso and her co-workers.

Natalie Levine was one of the sales staffers who called on Alfonso, and Levine arranged and attended many of the 70 speakers program events.  As CEO, Babich approved two years' worth of budgeted payments to Alfonso.

***

Alfonso is cooperating with the government, as might be expected for someone facing a possible sentence of 46 to 57 months in jail; her sentencing date has been pushed back twice, most recently for six months.  In the plea hearing transcript, prosecutors offered a pretty big clue about where Alfonso's cooperation might be taking the investigation.  For example, several Medicare Part D beneficiaries were described by prosecutors as ready to testify that she diagnosed them with having issues other than breakthrough cancer pain (the primary condition Subsys is indicated to treat) yet insurers still authorized the prescriptions.

As described in the transcript, Insys' prior-authorization unit changed Alfonso's diagnoses to cancer.  Absent the alleged changes, the prosecutor asserted, the insurers would have never paid for the prescriptions.

And as the Southern Investigative Reporting Foundation wrote in July, Medicare and commercial insurers appear to have approved reimbursement of prescriptions for Subsys at vastly higher rates than those of its rivals in the Fentanyl marketplace.

The prior-authorization unit was set up to assist patients with complex insurance paperwork.  Its value proposition was simple: The patient signs a few forms and Insys handles the messy paperwork.  Patients would get the medicine, prescribers wouldn't have to scramble for an alternate medication and Insys would book thousands of dollars in revenue per prescription.

> In reality what the prior-authorization unit did was take advantage of pharmacy-benefit manager inertia to work a type of bureaucratic alchemy, whereby a torrent of off-label Subsys prescriptions would be transformed into ones associated with medically urgent cancer diagnoses.

> Unmistakably, the prior-authorization unit was the key piece in helping Insys double the size of the Fentanyl marketplace to more than $500 million in less than two years.

48.     On this news, the price of Company shares declined $5.93 per share, or nearly 19%, from a close of $31.99 per share on December 2, 2015, to close at $26.06 per share on December 3, 2015.

49.     On January 25, 2016, SIRF published an article entitled "The Brotherhood of Thieves: Insys Therapeutics," alleging that Insys's executives have continued to pressure Company employees to develop new schemes to promote the illegal and improper off-label marketing and sale of Subsys.  The article stated, in relevant part:

> Executives at Insys Therapeutics have continued to pressure its employees to develop new ways to mislead insurance companies into granting coverage to patients prescribed its drug Subsys, even as the Food and Drug Administration's Office of Criminal Investigations issues a stream of subpoenas to former employees.

> ***

> Internal Insys documents and an audio recording of a PA unit meeting show that as recently as the late autumn executives were frantically brainstorming new ways to get around increasingly stringent pharmacy benefit manager rule enforcement.

> ***

> So Jeff Kobos, the prior authorization unit's new supervisor, wrote a new version of the spiel that was alternately called "Statement 13" or, in a homage to its confidential nature, "Agent 14."  It tried to thread a needle, designed to navigate both elevated PBM scrutiny and the rising level of compliance oversight required, while still allowing the unit's employees to try and guide PBMs to an approval.

*** 

The initial speaker (and the clearest voice) is PA executive Jeff Kobos who makes a pair of important admissions: at the 2:20 mark he acknowledged the unit's pattern of dishonesty by saying "when we were using [insurance codes for cancer-related pain diagnoses] for non-cancer [pain]."  At 4:30, he made jokes referring to "sandwiches" and "the sky is blue" as the kind of conversational gambits they should try and deflect PBM worker questions with.

At 5:00, David Richardson a trainer with the PA unit, suggests dropping the "Agent 14" spiel since it wasn't working.   A minute later, he and his wife, Tamara Kalmykova, an analyst with the PA unit, begin to discuss an idea he had in response to so-called smart-scripting, whereby PBMs use software analysis to determine if a patient--per the FDAs protocol--had tried another Fentanyl drug.

(Montgomery said smart-scripting was another development that Insys' PA staff couldn't readily steer around.)

Richardson suggested patients use a coupon for a free-trial prescription of Cephalon's Actiq.  The patient wouldn't pick the drug up but it would register in databases and allow PA staffers to plausibly claim that the patient was in full compliance with regulations.

50.     On this news, the price of Company shares declined $1.07 per share, or nearly 5%, from a close of $22.65 per share on January 24, 2016, to close at $21.58 per share on January 25, 2016.

## V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Insys common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, directors and officers of Insys, and their families and affiliates.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial

benefits to the parties and the Court.  According to the Company's Form 10-K filed with the SEC on March 3, 2015, Insys had more than 35 million shares of stock outstanding, likely owned by thousands of persons—subsequently increasing to more than 71 million shares outstanding after the Company's two-for-one stock split on June 5, 2015.

53.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Securities Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of Insys's common stock was artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

54.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

55.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI. LOSS CAUSATION/ECONOMIC LOSS

57. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. The price of Insys's common stock was artificially inflated throughout the Class Period by Defendants' false and misleading statements, and significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of Insys securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VII. SCIENTER ALLEGATIONS

58. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts that operated as a fraud or deceit on purchasers of the Company's common stock during the Class Period.

## VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

59. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    (a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b) The omissions and misrepresentations were material;

    (c) The Company's common stock traded in an efficient market;

    (d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    (e) Plaintiff and other members of the Class purchased Insys common stock between the time Defendants misrepresented or failed to disclose

material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts

60.     At all relevant times, the market for Insys common stock was efficient for the following reasons, among others: (i) as a regulated issuer, Insys filed periodic public reports with the SEC; and (ii) Insys regularly communicated with public investors through established market communication mechanisms, including through regular disseminations of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## IX.   NO SAFE HARBOR

61.     Defendants' "Safe Harbor" warnings accompanying their forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

62.     Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Insys who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**FIRST CLAIM**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

63.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.    During the Class Period, Insys and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Insys common stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

65.    Insys and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Insys common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   These Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

66.    Defendants had actual knowledge that their Class Period statements were materially false and misleading.

67.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     The Individual Defendants acted as controlling persons of Insys within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, Insys and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

72.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

(a) Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Lead Counsel;

(b) Awarding Plaintiff and the members of the Class damages and interest, in an amount to be proven at;

(c) Award Plaintiff all reasonable costs of prosecuting the litigation, including attorneys' fees and experts' fees;

(d) Award such other and further relief to Plaintiff as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: February 2, 2016.          Respectfully submitted,

BONNETT FAIRBOURN FRIEDMAN & BALINT P.C.

*s/Francis J. Balint, Jr.*
Francis J. Balint, Jr.
Andrew S. Friedman
2325 E. Camelback Road, Ste. 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Fascimile: (602) 274-1199
fbalint@bffb.com
afriedman@bffb.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KESSLER TOPAZ MELTZER & CHECK, LLP
Naumon A. Amjed
Ryan T. Degnan
Seamus D. Kaskela
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
skaskela@ktmc.com

GOLDBERG LAW PC
Michael Goldberg
Brian Schall
13650 Marina Pointe Dr., Suite 708
Marina Del Rey, CA 90292
Telephone: (800) 977-7401
Facsimile: (800) 536-0065
michael@goldberglawpc.com
brian@goldberglawpc.com

*Attorneys for Plaintiff Richard Di Donato*